**GULKOWITZ BERGER LLP**
Shaya M. Berger
544 Oak Drive
Far Rockaway, NY 11691
(212) 208-0006
sberger@gulkowitzberger.com

*Special Litigation Counsel for Plaintiff*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 11 |
| RAM DISTRIBUTION GROUP LLC<br>dba TAL DEPOT | Case No. 8-19-72701-las |
| Debtor. | |

-----------------------------------------------------------------X

| | |
|---|---|
| RAM DISTRIBUTION GROUP LLC<br>dba TAL DEPOT | Adv. Proc. No. 21-_____-las |
| Plaintiff, | |
| -against- | |
| ULTEGRA FINANCIAL PARTNERS, INC.<br>and ARTHUR YAKUBOV a/k/a ARTHUR JACOBS a/k/a<br>THOMAS DELVECCHIO | |
| Defendant. | |

-----------------------------------------------------------------X

## COMPLAINT

RAM DISTRIBUTION GROUP LLC dba TAL DEPOT, the debtor herein ("Ram" or "Plaintiff"), submits this as and for his Complaint (the "Complaint") against Defendants ULTEGRA FINANCIAL PARTNERS, INC. ("Ultegra") and Arthur Yakubov a/k/a Arthur Jacobs a/k/a Thomas Delvecchio and states as follows:

## The parties

1. Plaintiff is an online grocer, selling nonperishable groceries on its own website as well as on third-party seller websites.

2. Upon information and belief, Ultegra is a Colorado corporation duly formed under the laws of the State of Colorado, with a principal place of business at 1099 18th Street, Suite 2680 Denver, Colorado 80202. Upon information and belief, Ultegra is currently in delinquent status for failing to file periodic reports.

3. Upon information and belief, Arthur Yakubov a/k/a Arthur Jacobs a/k/a Thomas Delvecchio ("Delvecchio") is an individual residing in New York, New York and regularly conducts business at 750 Lexington Avenue, New York, New York 10022.

## Jurisdiction and Venue

4. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

5. The United States Bankruptcy Court for the Eastern District of New York is the proper venue for this proceeding in accordance with 28 U.S.C. §§ 1408 and 1409(a).

6. This adversary proceeding is brought pursuant to 11 U.S.C. §§ 105, 541(a), 542(b) and 1107(a) of the United States Bankruptcy Code and Rules 6009, and 7001 of the Federal Rules of Bankruptcy Procedure to recover the damages suffered by Plaintiff that were caused by Ultegra's breach of contract and Delvecchio's fraud, as more fully stated herein.

7. This adversary proceeding relates to the above-captioned bankruptcy proceeding pending in the Bankruptcy Court for the Eastern District of New York and is a "core proceeding" as that term is defined in 28 U.S.C. § 157 (a), (b)(2) and Bankruptcy Rules 7001 et. seq.

8. Should this Court determine that this adversary proceeding is not a core proceeding, the Plaintiff consents to the entry of final orders and judgment by this Court in this case.

9. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this case by Bankruptcy Rule 9015(a), Plaintiff demands a jury trial on all triable issues. Pursuant to 28 U.S.C. § 157(e), Plaintiff consents to this Court conducting a jury trial.

## Background

10. Plaintiff started operations in 2012 and grew from $250,000 in annual revenue to over $35 million in 2018. Plaintiff's CEO was Jeremy J. Reichmann. At its peak, the Debtor offered over 10,000 products and maintained great partnerships with vendors that enabled it to sell product fresh and operate on a cost-effective basis.

11. Plaintiff was at a critical juncture in the fourth quarter of 2016. Plaintiff had grown considerably since its inception in terms of gross revenue, workforce, its physical location and the variety and number of products for sale. However, such growth had reduced its profit margin. Plaintiff had several plans for growth, including increased marketing, expanding and improving its current equipment and infrastructure, improving personnel, opening new distribution centers in key areas in the United States with strong sales and automating facilities and expanding product offerings in core segments. Plaintiff needed funding to do all these things. In the fourth quarter of 2016, Plaintiff began investigating various options for obtaining such funding.

12. Plaintiff began working on an initial public offering ("IPO") in January 2017 with an investment banker.

13. That investment banker failed to complete the IPO process and their wrongful conduct is the subject of a pending adversary proceeding (Adv. P. No. 20-08081 (las)). Plaintiff

wasted hundreds of thousands of dollars and sixteen months of manpower on the IPO that the investment banker was incapable of completing.

14. Defendant was therefore in desperate need for cash and without any hope of obtaining funds through affordable means within the near future. Beginning in May 2018, Defendant was forced to turn to lenders ("MCAs") offering merchant cash advance agreements with impossible repayment terms.

## The Ultegra Facility

15. A man that went by the name "Thomas Delvecchio" had contacted Jeremy J. Reichmann in the summer of 2018 and claimed he was the President of an MCA called Alfa Advance. Beginning in the summer of 2018, Delvecchio arranged for Plaintiff to enter several deals totaling millions of dollars with MCAs, including Alfa, all under financially egregious terms, and all on the promise that refinancing deals with more money and better terms were coming.

16. Upon information and belief, Delvecchio's real name is Arthur Yakubov or Arthur Jacobs.

17. Upon information and belief, Delvecchio was not, nor was he ever, President of Alfa Advance, but he worked as an independent broker arranging MCAs from various MCA funders.

18. Delvecchio also made false representations to Mr. Reichmann by claiming that the initial MCA deals he was arranging for Plaintiff in July of 2018 would be followed by refinanced deals that would provide increased funding and better terms. Delvecchio knew no such deals were ever contemplated by any of the three MCAs he arranged to provide funding to Plaintiff in the summer of 2018. He made the false representations to Mr. Reichmann to induce Plaintiff to take the three financially egregious MCA deals in order to earn commissions.

4

19. By October 2018, Plaintiff was running out of time to rescue its business. Delvecchio told Mr. Reichmann he had the answer. Delvecchio represented that he was able to arrange for Plaintiff to obtain a $1.5 million credit facility from a commercial lender (the "Ultegra Facility"), not a merchant cash advance from an MCA. Delvecchio put Mr. Reichmann in touch with Mohammad Howard, Managing Principal of Ultegra.

20. Howard presented Plaintiff with a term sheet in the last week of October 2018 offering Plaintiff a proposed $1.5 million credit facility (the "Term Sheet"). The term sheet required Plaintiff to pay $45,000 as a due diligence fee, with $35,000 due at the signing of the term sheet and $10,000 due at the signing of the commitment letter.

21. Plaintiff was concerned about the high due diligence fee. On or about October 30, 2018, Delvecchio represented to Mr. Reichmann that (a) this $10,000 was to cover Delvecchio's fee for brokering the deal between Plaintiff and Ultegra; (b) as such, he controlled that portion of the fee and he would waive it, and (c) because of Delvecchio's waiver, Plaintiff would not be required to pay more than the $35,000 being paid with the signing of the Term Sheet.

22. Induced by and relying upon Delvecchio's representation, on October 30, 2018, Plaintiff executed the term sheet and the next day wired the $35,000 fee to Ultegra.

23. Delvecchio knew his representation was false, that he had no power to waive the additional $10,000 fee and that Plaintiff would have to pay it to receive a commitment from Ultegra to fund the Ultegra Facility. Delvecchio made the false representation to induce Plaintiff to sign the Term Sheet.

24. The Term Sheet stated that upon signing, a commitment letter to Plaintiff was anticipated within 7 to 10 days and the closing within 10 to14 days.

25. Ultegra soon provided Plaintiff with a list of information and document requests, purportedly as part of its due diligence. Plaintiff provided all responses shortly thereafter.

26. On November 13, 2018, Ultegra provided Plaintiff with a commitment letter (the "Commitment Letter"). Plaintiff signed and returned the Commitment Letter on November 15, 2018. In the Commitment Letter, Ultegra stated it completed its due diligence and "extend[ed] its commitment for financing" the proposed $1.5 million Ultegra Facility. Upon presenting the signed Commitment Letter to Howard, Howard told Mr. Reichmann that the deal would be funded and close "within days."

27. Plaintiff only signed the Term Sheet and Commitment Letter. No other agreements were delivered to Plaintiff and no other agreements were signed by Plaintiff.

28. On November 21, 2018, Howard said funding could not occur without the additional $10,000 fee being paid. When told of Delvecchio's representation that the $10,000.00 fee was targeted to him as broker of the deal and would be waived, Howard told Mr. Reichmann that was not the case and the deal could not close without that payment being made.

29. Delvecchio had lied to Mr. Reichmann to induce Plaintiff to execute the Term Sheet, proceed with the due diligence, and become completely reliant on pursuing the Ultegra Facility.

30. Plaintiff had no choice because it desperately needed the funding to stay in business. On November 26, 2018, Plaintiff wired the additional $10,000 to Ultegra.

31. On or about November 26, 2018, after Plaintiff had wired the $10,000 additional fee, Delvecchio represented to Mr. Reichmann that the Ultegra Facility would close and funding would commence within days.

32. On December 4, 2018, the Ultegra Facility still had not closed. Howard told Mr. Reichmann closing documents would be sent the next day. On December 10, 2018, despite repeated emails requests for closing documents, no closing documents had been sent. Mr. Reichmann emailed Howard inquiring about the status. Howard did not respond.

33. On December 19, Mr. Reichmann texted Howard and asked for a status. Howard responded, "Sorry for the drop off, hopefully Thomas has kept you in the loop, as he as kept us in the loop." Mr. Reichmann replied that Delvecchio had not told him anything in two weeks and he has been waiting for the closing documents. Howard did not respond. Mr. Reichmann then sent a final email to Howard on December 19, 2018, asking for confirmation whether the parties were going to close on the Ultegra Facility. Howard did not respond and never contacted Mr. Reichmann again.

34. It was now clear that Delvecchio and Ultegra worked together to damage Plaintiff. Delvecchio and Howard preyed on Plaintiff, knowing its precarious financial condition, and extracted $45,000 from Plaintiff.

35. Delvecchio did so by falsely representing that Ultegra would waive $10,000 of the due diligence fee and that Ultegra would close and provide the Ultegra Facility to Plaintiff when Delvecchio knew neither were true.

36. Ultegra went along with the scam, going so far as to provide Plaintiff with a binding Commitment Letter with the intent of not closing the deal. Both Howard and Delvecchio knew that Ultegra would never provide any funding to Plaintiff and only wanted to make an easy, quick profit off the purported due diligence fee. Ultegra breached the Term Sheet and Commitment Letter by failing to fund the Ultegra Facility.

7

37. Ultegra and Delvecchio's wrongful conduct caused Plaintiff to suffer millions of dollars in damages. On December 1, 2018, Plaintiff had a total outstanding MCA debt in the amount of approximately $2.5 million. The Ultegra Facility was to be used in part to pay off some of that that debt and in part to fund operations, enabling Plaintiff to increase its revenue and pay off the MCA debt in its entirety. Without the Ultegra Facility, not only was Plaintiff unable to pay down its existing MCA debt, but Plaintiff was also forced to enter additional MCA arrangements. As a direct result of Delvecchio's fraud and Ultegra's failure to honor its commitment to fund the Ultegra Facility, Plaintiff's total debt from MCAs rose to approximately $4.2 million by February 2019. Thus, Plaintiff suffered $1.7 million in damages in increased debt due to having to take on alternative financing to the Ultegra Facility.

38. Additionally, Plaintiff was never able to escape its MCA debt and filed for bankruptcy shortly after Delvecchio's and Ultegra's wrongful conduct. While Plaintiff earned approximately $34 million in revenue in the year prior to its bankruptcy filing, in its approximately two years in bankruptcy, Plaintiff has earned between $1 million and $2 million each year. Plaintiff requires $65 million so far to be placed in the position it was prior to Ultegra's failure to fund and Delvecchio's fraud. Plaintiff is nowhere near its full operating earning capacity and these losses will continue to mount.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Breach of Contract Against Defendant Ultegra)**

39. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "38" as though fully set forth herein.

40. Plaintiff and Ultegra entered a binding contract upon Plaintiff's receipt of and signing of the Commitment Letter, and Plaintiff paying the $45,000 due diligence fee.

41. Under the Commitment Letter, Ultegra was obligated to fund the Ultegra Facility to Plaintiff.

42. Ultegra breached the Commitment Letter by failing to provide any funding of the Ultegra Facility to Plaintiff.

43. As a result of the aforementioned breach, Plaintiff suffered damages in an amount of at least $65 million.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**(Intentional Fraud Against Defendant Delvecchio)**

44. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "43" as though fully set forth herein.

45. In July 2018, Delvecchio falsely represented to Plaintiff through Mr. Reichmann his identity and that he was President of an MCA.

46. At that time Delvecchio also made false representations to Mr. Reichmann by claiming that the initial MCA deals he was arranging for Plaintiff in July of 2018 would be followed by refinanced deals that would provide increased funding and better terms. Delvecchio knew no such deals were ever contemplated by any of the three MCAs he arranged to provide funding to Plaintiff in the summer of 2018.

47. Delvecchio made these false representations to Plaintiff through Mr. Reichmann to induce Plaintiff to agree to these three financially egregious MCA deals in the summer of 2018 so that Delvecchio would earn commissions. Plaintiff relied on Delvecchio's false representations when entering these three MCA deals.

48. On or about October 30, 2018, Delvecchio represented to Plaintiff through Mr. Reichmann that (a) $10,000 of the due diligence fee under the Term Sheet was to cover Delvecchio's fee for brokering the deal between Plaintiff and Ultegra; (b) he controlled that portion

of the fee and that he would waive it; and (c) because of Delvecchio's waiver, Plaintiff would not be required to pay more than the $35,000 being paid with the signing of the Term Sheet.

49. Delvecchio made these statements knowing them to be false and with the intent to cause Plaintiff to sign the Term Sheet, participate in the due diligence process, sign the Commitment Letter and be forced to pay the remaining $10,000 fee when required by Ultegra.

50. On or about November 26, 2018, Delvecchio represented to Plaintiff through Mr. Reichmann that if Plaintiff paid the remaining $10,000 fee, Ultegra would close on the Ultegra Facility within a few days.

51. Delvecchio made these statements knowing them to be false and with the intent to cause Plaintiff to pay the full $45,000 fee.

52. Plaintiff relied on Delvecchio's false representations when signing the Term Sheet, signing the Commitment Letter, when paying the initial $35,000 fee and the final $10,000 fee.

53. As a result of the aforementioned fraud, Plaintiff suffered in damages in an amount of at least $65 million.

**WHEREFORE,** Plaintiff demands judgment against the Defendant in the amount of at least $65 million, with the exact amount to be determined at trial, with interest thereon, and for such other further relief as may be just and proper.

Dated: March 24, 2021
      Far Rockaway, New York

                      **GULKOWITZ BERGER LLP**

                      By: /s/ Shaya M. Berger

                      Shaya M. Berger
                      544 Oak Drive
                      Far Rockaway, NY 11691
                      (212) 208-0006
                      sberger@gulkowitzberger.com

                      *Special Litigation Counsel for Plaintiff*